In passing upon these exceptions this court said:

"In support of the exceptions of no right or cause of action counsel for defendants contend that the obligations of a contractor, under Act No. 224 of 1918, for the construction of a public work, the obligations of his surety, and those of the public authority for which the work is done, to pay for labor and materials used in the work, are by law restricted to creditors of the contractor and his subcontractors, and do not extend to creditors of materialmen, and that, since plaintiff is merely a furnisher of material to another furnisher of material, it is without any right of action against defendants. * * *

"The plain terms of this section [section 1 of Act No. 224 of 1918] restrict its operation to creditors of the contractor and of subcontractors. [Italics by this writer.] * * * In the instant case, plaintiff, J. Watts Kearny & Sons, is a materialman, who furnished materials to the Weaver Sand Company, Inc., another materialman, who sold and delivered the same materials to W. O. Perry, contractor. * * * Weaver Sand Company, Inc., was not a subcontractor, as it had not contracted with Perry, the contractor, to do any work embraced in his original contract with the Louisiana highway commission. Plaintiff, therefore, is not a creditor of the contractor, W. O. Perry, nor of any subcontractor, and is not entitled to the protection of Act No. 224 of 1918.

"The conclusion we have reached is supported by the following authorities: [Citing them.] * * *

"Plaintiff's petition was amended to declare * * * etc. [But]

"The only new fact alleged in the amended petition is that the Weaver Sand Company, Inc., agreed to deliver the sand [gravel] piled along the roadside embankment at regular intervals [every fifty feet]. That agreement was not an undertaking to perform any part of the original contract with [of] Perry, the contractor, but the delivery of the gravel was a mere incident of the sale of same.

"The amendment was properly allowed, as the agreement additionally alleged did not make plaintiff [Weaver?] a subcontractor."

## V.

We adhere to the ruling thus made; we think it sound and correct in all respects. The section above referred to (section 1 of Act No. 224 of 1918) protects, and was meant to protect, only the creditors of contractors and subcontractors. Otherwise where would the far-flung "protection" of the statute cease? If the furnishers of material to materialmen, ad infinitum, are successively to have their recourse against the contractor, and the contractor's surety, and the work, and the owner of the work, then it will be all an endless chain, for we know by the (doubtless truthful) claim of a certain public utility that it requires the bringing together of the products (both crude and finished) of some three score or more nations, regions, and climes, to produce merely one small part of one certain small household necessity.

## VI.

And whilst unquestionably a sale is a contract, since every agreement binding in law is also a contract; yet the contractor whom the law intends by Act No. 229 of 1916 and Act No. 224 of 1918, is one who constructs for another some work of fixed and permanent nature, which can neither be kept nor disposed of, but must be surrendered to him for whom the work was done; and a subcontractor is one who undertakes to do for the contractor part of the work which the contractor has undertaken.

We see in this case no contractor or subcontractor, but simply a sale and a resale. And we think the trial judge did not err in disposing of the case as he did.

### Decree.

For the reasons assigned, the judgment appealed from is affirmed.

### ANTOINE v. HAMILTON.
No. 1055.

Court of Appeal of Louisiana. First Circuit. Dec. 6, 1932.

Charles J. Mundy, of New Orleans, for appellant.

E. S. Muse, of St. Francisville, for appellee.

ELLIOTT, J.

The plaintiff, Myra Dillon Antoine, alleges that on or about January 31, 1931, D. M. Hamilton forcibly and by threats and violence set upon and took away from James Dillon, Smith Stewart, and Willie Perkins a mule belonging to her, and unlawfully and without her consent keeps and detains the mule from her. She claims of said Hamilton the value of the mule, alleged to be worth $85, and $1,000 on account of the unlawful taking and conversion.

The defendant admits taking, but denies that plaintiff is the owner of the mule. He avers that the mule belongs to him and that he had a right to take it, and denies the violence and threats alleged to have been used.

The case was tried by a jury, and the verdict of the jury was in favor of the defendant, rejecting plaintiff's demand. The verdict was approved by and made the judgment of the court. Plaintiff has appealed.

Defendant-appellee moves to dismiss the appeal on the ground that plaintiff-appellant has failed and neglected to file a devolutive appeal bond in accordance with the order for appeal granted by the court, but in lieu thereof simply filed in the court a cashier's check for $100, the amount fixed by the court for a devolutive appeal. Appellee's motion to dismiss was filed on September 23, 1932. When this court convened on October 3, 1932, appellee, "with full reservation of all rights under his motion filed an answer to the appeal praying for the affirmance of the judgment appealed from."

Appellant does not contend that this answer has waived appellee's motion to dismiss. The answer was filed under "full reservation of all rights under the motion to dismiss." The motion to dismiss has not been waived.

The record contains a letter from Charles J. Mundy, plaintiff's attorney, to the clerk of court of West Feliciana parish, as follows:

"New Orleans, La., Sept. 15, 1932.

"Miss Florence Golsan, Clerk of Court,
"St. Francisville, La.

"Dear Madam:

"Inclosed please find cashier's check No. 20425 of the Citizens Branch Office of the Canal Bank & Trust Co. of New Orleans in the sum of $100.00 in lieu of bond for devolutive appeal (this being a cash bond) in the case of Myra Dillon Antoine vs. D. M. Hamilton No. 465 on the docket of your court. Please forward the record to the Clerk of Court of Appeals at Baton Rouge, Mr. Carl Leche, as soon as possible and please also notify me the day it is sent. I believe the appeal is returnable on September 24th 1932. I presume that you filed in the record a certificate showing that the cash has been deposited in lieu of bond in this matter.

"Awaiting your early reply, I am very truly yours,

"Charles J. Mundy."

At the bottom of the letter we find the following: "I certify that I have received check for $100.00 referred to in the above letter and have deposited same in the registry of the court in an account carried in the Bank of Commerce & Trust Co. and am holding same in lieu of a bond for a devolutive appeal in the case referred to in the above letter. This 17th day of September 1932. St. Francisville, La. Florence F. Golsan, Clerk of 20th Judicial district court, Parish of West Feliciana, La."

This letter and certificate is all the record contains on the subject.

Appellee admits that a deposit can be made with the clerk of court in lieu of a bond with security, but contends that an appellant making a deposit of the kind must first show in the lower court that he cannot give the bond provided for by the Code of Practice, arts. 574, 575, 578, 579, and that a deposit for the purpose of an appeal under the Civil Code, arts. 3065, 3140, must be authorized by the court which granted the appeal, and that as no such authority was obtained by appellant, he insists upon his motion to dismiss.

The Civil Code, art. 3065, provides as follows: "The person who can not give a surety is admitted to give a pledge or other satisfaction sufficient to secure the debt, provided that the thing given in pledge may be kept without difficulty or risk. He may also deposit in the hands of the public officer, whose duty it is to receive the surety, the sum for which he is required to furnish a surety."

Article 3140 provides: "Pledge may be given not only for an obligation consisting in money, but also for one having any other object; for example, a surety. * * *"

In Lanata v. Bayhi, 31 La. Ann. 229, cited by appellant, authority to deposit $150 in lieu of a bond was obtained from the court.

In State ex rel. Rayssiquier v. Monroe, Judge, 37 La. Ann. 113, the judge a quo authorized a deposit of cash in lieu of a bond.

In Sauer v. Union Oil Co., 43 La. Ann. 699, 9 So. 566, 567, authority from the court to give municipal bonds, in lieu of a personal security, was obtained after personal bond which had been given turned out to be unsatisfactory. In that case a motion to dismiss was filed on the ground that appellee had not been cited to answer the second order, the one permitting the deposit in lieu of a bond. The court in acting on the motion said: "It was useless for the appellant to have again moved and petitioned, on the 2d of January, 1891, for a suspensive appeal, and for leave to furnish the public securities, instead of a personal obligation with a surety, as is usually done. The appeal had been previously asked and granted. The subsequent proceedings to the same effect were superabundant. They did not amend or modify the anterior ones. The appellant does not derive from the court, but from the law, the privilege of substituting valuable public bonds for an ordinary security, as is usually done."

In Mitchell v. Murphy, 131 La. 1033, 60 So. 674, 675, a certified check was left with the clerk of court bearing on it a memorandum as follows: "This check was left with F. A. Leonard as security on attachment bond in suit ——— v. Murphy, Sept. 12, 1911." The opinion shows that there were several suits filed by Mitchell against Murphy and the check was not properly identified with the suit in which it was sought to be used in lieu of an attachment bond. The opinion says: "There is nothing in the record to identify this certified check with the record in this case." And in another place it is said: "There was no writing whatever attending the delivery of this pledge, which could be made only by a person who was not able to give a bond and personal surety; and it had to be made in the place of a surety, which the plaintiff could not give." And further on: "If plaintiff had been careful to have filed some instrument as a bond with the clerk, stating that he was making a pledge of a $6,000 check, and that the pledge was made instead of a regular surety on bond in the case where a bond was required, thus stating its nature and object, and he had delivered such instrument to the clerk of the court for filing, and the same had been filed in the cause, he would have conformed to the law."

■■ The letter from Mundy to the clerk was not filed, at least we see nothing on it to that effect, but it was delivered to the clerk and bears on it an official certificate showing its receipt and purpose and the motion to dismiss alleges that the check was filed, which was sufficient.

The letter and the certificate attached to it identifies the cashier's check with this suit and makes it plain that it is to stand herein in lieu of an appeal bond. The language in Sauer v. Union Oil Co. that "the appellant does not derive from the court, but from the law, the privilege of substituting valuable public bonds for an ordinary security, as is usually done," as well as that used in Mitchell v. Murphy, shows that it is sufficient if it appears that the deposit is intended in lieu of an appeal bond and the writing accompanying it identifies it with the case. As for the requirement that a person who cannot give a surety is admitted to give a pledge or other satisfaction, the letter does not say that the appellant cannot give a bond; but the motion to dismiss is not based on that ground. The motion merely urges that the appellant has failed and neglected to file a devolutive bond in accordance with the order for appeal, but in lieu thereof, simply filed in the court a cashier's check for the amount of the bond. It may be assumed from the ground urged that appellee was satisfied that appellant could not furnish a bond.

■ Appellee has cited us to a number of decisions, but none of them justify the dismissal of this appeal on the ground on which the motion is based. An appeal is rather to be favored than refused.

The motion to dismiss is overruled.

The plaintiff testifies that she bought the mule in question from the defendant for $85, paying for it by means of two checks, one for $55 bearing date January 28, 1928, and the other for $30 bearing date February 21, a total of $85.

The evidence shows that checks were made payable to the defendant; that she sent them from where she lives in New Orleans to the defendant in West Feliciana parish by mailing them to her father, requesting him to deliver them to the defendant. That defendant received them and cashed them. She testifies that she wrote defendant January 22, 1928, desiring to buy the mule, and he answered her letter on January 28, 1928, in which he agreed to sell her the mule for $85. That she accepted the mule at the price fixed and paid the price, as above stated. That her father had previously rented the mule from defendant and that after her purchase he retained possession for her.

The testimony of the plaintiff on the subject is direct and explicit.

The record indicates that she has use for a mule. It appears that she is the owner of 210 acres of land in the neighborhood of the defendant. A tax receipt shows that for the year 1929 she was assessed for a horse mule. She testifies that she paid the taxes in December, 1930, and that the mule referred to in the tax receipt is the mule in question.

The plaintiff, in the matter of buying the mule, is supported by her father, Ewell Dillon. He says that he had rented the mule from the defendant previous to the purchase by his daughter and had him in his possession, and that his daughter bought the mule and he then kept him in possession for his daughter. That his daughter, who lived in New Orleans, sent him checks payable to the defendant, in payment for the mule; that he delivered them to defendant in payment of the mule, taking a receipt for each check. The receipts given him by defendant were produced on the trial.

The testimony of the plaintiff and her father is further supported by Mrs. Coguenhem, who it appears lives in New Orleans and has had the plaintiff in her service for many years. Mrs. Coguenhem testifies that she remembers reading a letter from defendant to the plaintiff on or about the time mentioned, in which the defendant agreed to sell to plaintiff a mule for $85.

Questioned to ascertain why she was able to remember such a matter, she testifies that her husband was at the time sick and a circumstance in connection with his sickness fixed the date in her mind; that she remembers the matter perfectly well. She testifies that she offered to take the money and give the plaintiff her check to pay for the mule, but the plaintiff decided to get a cashier's check, as was done.

The letter which the plaintiff says she received from the defendant, and which Mrs. Coguenhem says she read, was not produced; the plaintiff claims that it was lost or destroyed.

The defendant objected to evidence of its contents and urges that its loss or destruction was not established. The lower court held that its receipt and loss or destruction was established and received the parol evidence tendered as to its contents. We have reviewed the evidence concerning its receipt and loss or destruction, and we agree with the lower court that it sufficiently appears and that parol evidence showing its contents was properly received.

Defendant denies that he received a letter from the plaintiff in which she desired to buy the mule and denies that he ever wrote her, in reply, agreeing to sell her the mule, but defendant in the course of his testimony makes some statements on the subject which invites doubt about his denial and rather indicates that he did not look on his act in taking the mule as a matter which the plaintiff could not question. We copy a few of the questions propounded to him and his answers thereto:

"Q. When was the first time you saw this woman? A. I think some times during the Summer months. I was at Laurel Hill and this nigger woman got off the train and I was getting my mail and when I got ready to leave this woman said she would like to see me. I asked her what she wanted and she said she wanted to know about the mule. She said she had bought the mule. I told her this was not a fact and the best thing to do is for you to get old Ewell and I would explain everything to them."

By old Ewell, he meant Ewell Dillon, plaintiff's father, who had brought him the checks. Now when he told her in response to her claim that she had bought the mule, that it was not a fact and the best thing for her to do was to get her father and he would explain everything to them, indicates that there was some question in his mind about his act in taking and his right to keep the mule, otherwise there would have been nothing on his mind that called for an explanation on his part to her concerning the matter in question between them. If that had not been the case, her claim of ownership would have met with an unqualified denial.

Defendant testified in effect that Ewell Dillon had rented from him this mule for the year 1927 and was to pay the rent in work, which he did not do; that he informed Ewell that he was going to take the mule away from him; that Ewell asked him for a little more time, saying that as soon

as the girl (meaning, we assume, the plaintiff) gets straight she would pay up all he owed. Asked about these checks:

"Q. When he brought the check for $55.00 what took place between you and he then? A. He brought me a check and said, there is the check my daughter sent you. He said, I want you to credit it to my account. I credited it to his account and gave him a statement; part of that check was credited to his rent and part to his grocery account.

"Q. What took place when he brought you the check for $30.00? A. Straightened out his mule rent to date and the other was applied to the balance and I gave him a receipt each time."

The defendant contends that the checks were in payment of a debt due him by plaintiff's father. The evidence shows that defendant is a merchant; but he produced no account of any kind against Ewell Dillon showing credit for these checks.

In another place:

"Q. And you swear that you did not write a letter to Myra Dillon about that mule? A. I never wrote her at all.

"Q. And then you want to tell the court and jury that that white lady that testified this morning did not tell the truth? A. She said she could not memorize what was in the letter and did not know the date or anything else."

This answer evades the question asked him. Instead of saying that the lady was mistaken, he criticizes her memory.

He was asked:

"Q. And then you did not write Myra Dillon anything? A. She might have gotten some correspondence I had with old Ewell or something. This woman I never saw in my life."

Defendant's testimony about having had correspondence with plaintiff's father is in opposition to the declaration of Ewell Dillon in open court on the trial in chief, in the presence of the defendant, that he did not know how to read or write. The evidence, moreover, shows that Ewell Dillon lives in defendant's neighborhood and called frequently at his place, and we can see no reason for his having correspondence with this old illiterate negro man, who had no property of any kind. Defendant reiterates that he never got a letter from the plaintiff and never wrote to her, and again referring to Mrs. Coguenhem:

"Q. Then when this woman (Mrs. Coguenhem) was on the witness stand and said she read the letter from you to Myra in which you said you would take $85.00 for the mule, she did not tell the truth, did she? A. We did not make any agreement about the mule at all. I don't know what old Ewell sent down there."

Defendant turns away from a plain question which called for an answer, concerning his claim to the mule, to talk about a matter not responsive to the question asked him; the truth of Mrs. Coguenhem's testimony is a highly important question in the case.

The receipt which plaintiff produced, and which the defendant admits he signed for the $55 check, says in effect: "Recd from Marie Dillasck for $55.00 for account of Ewell Dillas February 7th 1928."

That for the other: "Received from Myra Dillas $30.00 for account of Ewell Dillas May 10th 1928."

Defendant testifies that a statement to the same effect was written on the back of the check. The cashier's checks were not returned to the plaintiff and were therefore not produced. The statement in the receipts, that the checks were received on account of Ewell Dillon, is in line with defendant's contention that the checks were not intended to pay for the mule, but were intended by plaintiff to pay a debt due defendant by her father.

Plaintiff's testimony is positive that she did not owe her father anything and that she never undertook to pay anything he owed the defendant.

Plaintiff, asked why she did not have defendant correct the statement on these receipts, that same was for account of Ewell Dillon, says that she did not visit in West Feliciana parish more than once or twice a year; that she thought the receipts were sufficient.

It seems reasonable that if these checks had been intended to pay a debt due by her father that they would have been made payable to him.

It is our conclusion that plaintiff has established her ownership of the mule by a preponderance of the evidence on the subject and that the preponderance must have its proper effect.

■ As she was the owner of the mule, she is entitled to recover its value, $85.

■ The plaintiff claims $1,000 due to defendant's unlawful act in forcibly and violently taking the mule out of the possession of a party who was in charge of it for her account.

It is our conclusion that defendant took possession of the mule by means of violence and threats and by putting in fear those in charge of the mule; but we do not think plaintiff entitled to recover the amount that she claims on that account. Our conclusion is that she is entitled to recover, as damages on account of the violence and threats and forcible taking of the mule, the sum of $100, which makes a total of $185, for

which judgment will be rendered in favor of the plaintiff.

For these reasons the judgment appealed from is annulled, avoided, and set aside, and judgment is now rendered in favor of the plaintiff, Myra Dillon Antoine, and against the defendant, D. M. Hamilton, for $185, with legal interest thereon from judicial demand until paid.

Defendant and appellee to pay the cost in both courts.